1 | EDMUND G. BROWN JR.
Attorney General of the State of California
2 | DANE R. GILLETTE
Chief Assistant Attorney General
3 | GERALD A. ENGLER
Senior Assistant Attorney General
4 | PEGGY S. RUFFRA
Supervising Deputy Attorney General
5 | JULIET B. HALEY
Deputy Attorney General
6 | State Bar No. 162823
   455 Golden Gate Avenue, Suite 11000
7 | San Francisco, CA 94102-3664
   Telephone: (415) 703-5960
8 | Fax: (415) 703-1234
   Email: juliet.haley@doj.ca.gov
9 | Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **BRIAN ALAN MISQUEZ,** | C 07-4981 JSW (PR) |
| Petitioner, | |
| v. | |
| **KEN CLARK, Warden,** | |
| Respondent. | |

**MEMORANDUM IN SUPPORT OF RESPONDENT'S ANSWER TO THE COURT'S ORDER TO SHOW CAUSE**

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  JULIET B. HALEY
   Deputy Attorney General
6  State Bar No. 162823
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA 94102-3664
    Telephone: (415) 703-5960
8   Fax: (415) 703-1234
    Email: juliet.haley@doj.ca.gov
9  Attorneys for Respondent

10               IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      SAN FRANCISCO DIVISION

13

| | |
|---|---|
| **BRIAN ALAN MISQUEZ,** | C 07-4981 JSW (PR) |
| Petitioner, | **MEMORANDUM IN SUPPORT OF RESPONDENT'S ANSWER TO THE COURT'S ORDER TO SHOW CAUSE** |
| v. | |
| **KEN CLARK, Warden,** | |
| Respondent. | |

## STATEMENT OF THE CASE

The Contra Costa County District Attorney filed an information on April 3, 2002, charging petitioner with premeditated first degree murder (Cal. Pen. Code, § 187(a)), and with the allegation that he personally used a knife in the commission of the offense. (Cal. Pen. Code, § 12022(b)(1)). 2CT 383.

On July 8, 2004, the jury acquitted petitioner of first degree murder, found him guilty of the lesser offense of second degree murder, and found the allegation true. 2CT 734.

On October 29, 2004, the trial court sentenced petitioner to 15 years to life in state prison on the charge, and one year on the allegation, with credit for 1,200 days in custody. 3CT 1087.

Petitioner appealed and the judgment was affirmed by the California Court of Appeal on July 7, 2006. 3CT 1091. Petitioner's petition for review to the California Supreme Court was denied on October 11, 2006. Petitioner filed the instant federal habeas petition on September 26, 2007.

## STATEMENT OF FACTS

The state court of appeal found the facts to be as follows. This summary constitutes a factual finding that is presumed correct under 28 U.S.C. § 2254(e)(1). *Hernandez v. Small,* 282 F.3d 1132, 1135 n. 1 (9th Cir. 2002).

In view of the limited issues raised on appeal, the evidence can be briefly summarized.

Twenty-two-year-old Rogelio de Chavez lived with his sister in an apartment complex in El Cerrito. Upon returning home from work the evening of July 6, 2001, Rogelio's sister found Rogelio's body in a pool of blood in the living room with multiple stab wounds across his partially naked body. Expert testimony established that Rogelio had been stabbed 26 times in his torso, neck and head. Blood was smeared on the apartment door and walls, the living room sofa, and on the handle of one of the knives in the kitchen.

An investigation revealed that Rogelio had established an internet profile, "De La Salle Boy 97," identifying himself as a 22-year-old Filipino man. On the hard drive of his computer the police found a record of an internet conversation just after midnight on July 6 between "De La Salle Boy 97" and another online profile, "Pimp Ass Bling Bling B," that belonged to defendant. The exchange concerned a prospective sexual encounter, and at 2:11 a.m., "Pimp Ass Bling Bling B" downloaded a photograph of Rogelio.

Defendant testified and acknowledged that he had been at Rogelio's apartment on July 6, and admitted the stabbings. Previously, defendant had informed police that Rogelio had attempted to assault him and that a third person was present and came to his aid. During trial he provided a very different rendition of the events inside Rogelio's apartment, insisting that Rogelio was a predatory homosexual who threatened to rape him.

Defendant resided in Antioch with his girlfriend, Jennifer, and their two infant children. On July 6, Jennifer called defendant at work but did not reach him. Defendant telephoned Jennifer later that day, saying that he did not feel well and needed a ride home. Although defendant left for work that morning in his uniform, he arrived home in non-uniform attire. Jennifer testified that on the evening of July 6, defendant suggested for the first time that they move to Oregon. They began packing that night and took a bus to Oregon two days later, leaving their computer and other belongings at the home of defendant's father. Other friends and relatives of defendant testified to the sudden nature of the Oregon trip. Defendant's father, however, testified that defendant had informed him of his Oregon plans nearly a week before July 6, 2001.

Exh C, at 1-2.

## STANDARD OF REVIEW

A federal court may grant a writ of habeas corpus to a state prisoner only if the state

court's rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or were "based on an unreasonable determination of the facts in light of the evidence presented" in the state courts. 28 U.S.C. § 2254(d). Under the "contrary to" clause, a state court's decision is contrary to federal law if it "contradicts the governing law set forth in our cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000); *see also Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). If there is no Supreme Court precedent that controls a legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law. *Carey v. Musladin,* 127 S.Ct. 649, 653-54 (2006) (denying habeas relief in absence of clearly established federal law).

In order to warrant habeas relief, the state court's application of clearly established federal law must not be merely erroneous, incorrect, or even "clear error," but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003); *see also Williams v. Taylor*, 529 U.S. at 409; *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). It is the habeas petitioner's burden to make that showing. *Woodford,* at 25. In the same way, a "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 357 U.S. 322, 340 (2003). State court factual determinations are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even if the state court's ruling is contrary to or an unreasonable application of Supreme Court precedent, that error justifies overturning the conviction only if the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* standard applies to all § 2254 cases, regardless of the type of harmless error review conducted by the state courts. *Fry v. Pliler*, ___ U.S. ____ , 127 S.Ct. 2321 (2007).

# ARGUMENT

## THE DECISION NOT TO REMOVE THE JUROR DID NOT DENY PETITIONER DUE PROCESS OR A FAIR OR IMPARTIAL JURY

Petitioner claims the trial court erred in denying his challenge for cause to a juror who purportedly slept during trial and failed to timely report that his grand-nephew had been murdered during the course of the trial, in violation of his rights to trial by jury and due process of the law.

### A. The State Court's Analysis Of The Claims

The state court rejected the claims, finding and reasoning as follows:

Defendant first argues that the trial court erred in refusing to dismiss a juror who was sleeping and whose grand-nephew was the victim of another murder during the course of the trial. Defendant contends that the trial court abused its discretion and violated his constitutional rights to an impartial jury and due process. (U.S. Const., 6th 14th Amends.; Cal. Const., art. 1, §§ 16; *Irvin v. Dowd* (1961) 366 U.S. 717, 722.)

Section 1089 [FN2] permits the court to discharge a juror at any time during the trial upon death, illness, or other good cause indicating that a juror is unable to perform the duties of a juror. (See *People v. Abbott* (1956) 47 Cal.2d 362, 371; *People v. Dell* (1991) 232 Cal.App.3d 248, 256.) On appeal, "[t]he court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence." ( *People v. Holt* (1997) 15 Cal.4th 619, 659.)

FN2. Section 1089 states: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box, and be subject to the same rules and regulations as though the alternate juror had been selected as one of the original jurors."

On the eighth day of trial, the court interrupted the cross-examination of a witness to ask Juror No. 159 whether he was paying attention, since he appeared to be dozing.[FN3] The juror replied that he was listening. Outside the presence of the jury on day ten, the court remarked that Juror No. 159 was having trouble staying awake, but both the court and defense counsel indicated they thought the juror was paying attention. The next day the victim's family reported that they believed Juror No. 159 was sleeping the day before and during both the morning and afternoon sessions on day eleven. The judge remarked that he had been carefully watching Juror No. 159 and that he seemed to be following the proceedings despite occasional drowsiness.[FN4] The following morning the judge told the jury that he had observed some jurors appearing tired and admonished them to pay attention. Several days later, during closing argument, Juror No. 159 disclosed to the court that his grand-nephew had been murdered six days before and inquired about his ability to attend the funeral. The court and counsel then retired to chambers and questioned the juror as to his ability to continue serving as an impartial juror, and the juror assured the court that he could do so. After the juror had left the judge's chambers, defense counsel requested that the juror be discharged, also noting that the juror appeared to be sleeping during her closing argument. The trial judge assured her that he was observing Juror. No.

Memorandum In Support Of Respondent's Answer To The Court's Order To Show Cause - C 07-4981 JSW (PR)

4

159 and that he had not been sleeping.[FN5] The court denied the motion to discharge the juror, and later denied a motion for a new trial based in part on the ground that the juror should have been dismissed for sleeping.

FN3. The record also contains an indication that the juror may have been observed dozing during jury selection.

FN4. The court stated: "I've been watching him very vigorously all day.... I'm very sensitive about this issue, and I have not observed him in a state of what I would call sleeping. I observed him acting drowsy as I did number two and seven this afternoon, meaning eyes closed and head off to one side. [¶¶] So-but everybody seems to come awake at the next sentence or next question. Juror No. 159, a little more slowly."

FN5. The court stated: "No. Actually, I've been watching ... and he's making it his business, even though he may be tired, to stay awake and listen. So I can't say he's been sleeping. And I've been watching him closely."

Courts have consistently refused to discharge a juror for sleeping absent convincing proof that the juror actually slept during material portions of the trial. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 411.) Here, unlike the situation in *People v. Johnson* (1993) 6 Cal.4th 1, 21 (*Johnson*) where "[t]he court, its two deputies, and the prosecutor each stated on the record that they had observed defendant exhibiting various physical indicia of sleep, including eye closures, head nodding, and slumping in his chair,'" nobody was certain that Juror No. 159 was actually sleeping. The court was alerted to the situation and paid particularly close attention to be sure that he was not. On one occasion the judge stated that he "'was almost ready to stop this process twice when [the juror] turned a page and indicated ... that he was paying attention of a kind.'" We are in no position to say that the court erred in refusing to discharge Juror No. 159 since the record contains no convincing proof that he actually fell asleep. (See *Hasson v. Ford Motor Co., supra,* at p. 411.)

Defendant insists that heightened attention was necessary for the juror to grasp his contention concerning imperfect self defense. However, there is nothing in the record to suggest that the juror did not understand his argument or the admittedly proper instructions on this issue, nor is there any evidence that the juror did not intelligently participate in the deliberations on defendant's imperfect self-defense claim or on any other issue. (See *People v. Bowers* (2001) 87 Cal.App.4th 722, 731 [reversing a conviction for improperly discharging a juror, with the explanation that "the bare fact of sleeping at an unknown time for an unknown duration and without evidence of what, if anything, was occurring in the jury room at the time is insufficient to support a finding of misconduct or to conclude the juror was unable to perform his duty"].)

Defendant also argues that the murder of the grand-nephew of Juror No. 159 during trial rendered him a biased juror. The court will not presume bias, and will uphold the trial court's discretionary decision to retain a juror absent substantial evidence to the contrary. (*People v. Holt, supra,* 15 Cal.4th at p. 659.) Here, there was no misconduct on the part of Juror No. 159, such as withholding pertinent information during voir dire examination, since his grand-nephew was not killed until the trial was well underway and the juror brought the killing to the court's attention on the second court day after it occurred. (*In re Hamilton* (1999) 20 Cal.4th 273, 294.) Even if not "misconduct" in a pejorative sense, a juror's involuntary exposure to nontrial events may demand an inquiry into bias. (*Id.* at pp. 294-295.) Here, the court did exactly what it should have done upon learning of the nature of the nephew's death. The court brought the juror into chambers with counsel and inquired whether he believed he was capable of continuing with the trial. He responded, "Yes, I do." The court asked, "So are you still going to be able to keep your mind on this

> case and not be overcome by the needs that you have for the funeral or to help the people there?" Juror No. 159 replied, "I think-I know I can do the job here." The attorneys were given an opportunity to question the juror. Defense counsel asked whether the murder would encroach upon the trial, whether the juror would equate his grand-nephew's killing with the killing involved in the trial, and whether the juror could continue to pay attention. The juror answered the first two questions in the negative and replied affirmatively to the third. The trial court again asked the juror if he would be able to devote his full attention to the case and he replied that he would. When the questioning was completed, the court indicated it was satisfied with the juror's ability to continue serving fairly. We cannot say that the court abused its discretion in accepting the juror's assurances and permitting the juror to continue serving.

Exh. C, at 3-6.

### B. The State Court's Analysis Was Neither Contrary To Nor An Unreasonable Application Of Supreme Court Authority

Under California law, the question of whether the circumstances of a given case present grounds sufficient to warrant removal of a juror is a question entrusted to the trial court's sound discretion, and the court's finding on that issue will be sustained if supported by substantial evidence. *People v. Johnson,* 6 Cal.4th 1, 21 (1993). The court's discretion is not unlimited, however, and a juror's inability to perform the functions of a juror must appear in the record as a demonstrable reality and courts must not presume the worst of a juror. *People v. Collins*, 17 Cal.3d 687, 696 (1976). Before a juror may be removed, there must be "convincing proof that a juror actually slept during the trial." *People v. Johnson,* 6 Cal.4th at 21.

Federal law is in accord. A sleeping juror does not constitute juror misconduct in violation of a defendant's due process rights unless the defendant was prejudiced to the extent that he did not receive a fair trial. *See United States v. Barrett,* 703 F.2d 1076 (9th Cir.1983). In short, a sleeping juror should be removed if the sleep has made it "impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial." *United States v. Freitag,* 230 F.3d 1019, 1023 (7th Cir.2000). But courts are not automatically required to remove a sleeping juror; instead they have a considerable amount of discretion in determining how to handle the situation. *Id.; see also United States v. Barrett,* 703 F.2d 1076, 1083 (9th Cir.1982); *United States v. Springfield,* 829 F.2d 860, 864 (9th Cir.1987).

Here, as the state appellate court found, the trial court determined that there was no convincing proof that juror 159 had ever fallen asleep at any time during the trial. That factual

finding is presumed correct, 28 U.S.C. § 2254 (e)(1), and was not unreasonable, 28 U.S.C. § 2254 (d)(2). The court expressed its concerns about juror 159 and noted it was watching him closely in order to ascertain that he was not actually asleep. Defense counsel did not initially express any concerns and agreed with the court's assessment that juror 159 had turned the pages of the transcript at the appropriate times while petitioner's taped statement was being played. Since there is no evidence that juror 159 actually slept during trial, and no evidence he was unable to perform his duty, the trial court properly denied petitioner's motion to discharge him on that basis.

Even if juror misconduct occurred, it did not have a substantial or injurious effect on the verdict. *Frye v. Pliler*, ___ U.S. ____ , 127 S.Ct. 2321; *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997). There was overwhelming evidence of guilt, consisting of petitioner's admission that he was the killer, and the brutal nature of the victim's stab wounds, including post-mortem wounds to his back, which conclusively established intent to kill. *In re Malone,* 12 Cal.4th 935, 964 (1996); *People v. Marshall*, 50 Cal.3d 907, 951 (1990). Petitioner's claim of imperfect self-defense was not convincing in light of the evidence that petitioner came to the victim's apartment after arranging a consensual sexual encounter. Petitioner also told inconsistent stories about how the victim died, and then hastily moved out of state after the incident, all of which constituted compelling evidence of his guilt of second degree murder.

With respect to the murder of juror 159's grand-nephew, the court held a full hearing on the issue, including thorough questioning of juror 159 both by the court and defense counsel, before determining that the murder and pending funeral did not provide good cause that the juror could not be a fair and impartial juror. No more was required. *Dyer v. Calderon,* 151 F.3d 970, 974-75 (9th Cir. 1998) (en banc). ("[D]ue process requires only that all parties be represented, and that the investigation be reasonably calculated to resolve the doubts raised about the juror's impartiality").

The record makes clear that throughout those proceedings juror 159 stated that he could "do the job." 12RT 2408-2409. Based on his unequivocal responses that he could continue to perform his duties as a juror, the court determined that he could still be fair and impartial and that the event did not render him unfit to serve as a juror. The trial court's finding of no bias is entitled to a presumption of correctness under 28 U.S.C. § 2254 (e)(1). *Patton v. Yount*, 467 U.S. 1025,

1037 n.12 (1984). Petitioner provides no contrary evidence to refute that presumption. The state court's rejection of the claim was not unreasonable.

**CONCLUSION**

Accordingly, respondent respectfully requests that the petition be denied.

Dated: March 19, 2008

Respectfully submitted,

EDMUND G. BROWN JR.
Attorney General of the State of California

DANE R. GILLETTE
Chief Assistant Attorney General

GERALD A. ENGLER
Senior Assistant Attorney General

PEGGY S. RUFFRA
Supervising Deputy Attorney General

/s/ Juliet B. Haley

JULIET B. HALEY
Deputy Attorney General

Attorneys for Respondent

JBH:jw/cfl
40230115.wpd
SF2008400413